AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 37545 37th Street East, Palmdale, California 93550 | ) | Case No.  2:24-mj-02827 |
| | ) | |
| | ) | |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-2*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of firearm |
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the unlicensed business of firearms dealing |
| 18 U.S.C. § 922(o) | Transfer or possession of a machine gun |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*/s/ Arie Kuipers*
*Applicant's signature*

Arie Kuipers, ATF Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Alka Sagar, U.S. Magistrate Judge

AUSA: Daniel H. Weiner (x 0813)

**ATTACHMENT A-2**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is located at 37545 37th Street East, Palmdale, California 93550 ("**SUBJECT PROPERTY**"). The **SUBJECT PROPERTY**, as depicted in the photograph below, is a one-story house located on the West side of 37th Street East, South of East Avenue R 8.  The house is tan in color, with a red tile roof.  The address "37545" is clearly posted on a pillar in front of the house, located next to the front door.

The area to be searched at the **SUBJECT PROPERTY** including all rooms, annexes, attics, basements, porches, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers, locked containers and safes, cabinets, rooms, parked vehicles, motorhomes, sheds, trailers, and outbuildings associated with the **SUBJECT PROPERTY** and shall extend into desks, cabinets, safes, briefcases, backpacks, wallets, purses, trash receptacles, digital devices, and any other storage locations within the **SUBJECT PROPERTY**.



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm), 922(a)(1)(A) (Engaging in the Unlicensed Business of Firearms Dealing), and 922(o) (Transfer or Possession of a Machine Gun) (the "**Subject Offenses**"), namely:

a.    Firearms; including but not limited to shotguns, handguns, revolvers, rifles, machine guns, assault rifles/pistols and semi-automatic, select fire weapons;

b.    Component parts used to construct firearms including but not limited to, frames, receivers, barrels, bolts, stocks, magazines, firing pins, extractors, ejectors, sights, floor plates, and trigger assemblies;

c.    Publications, manuals schematics, video tapes, drawings and blueprints showing the assembly of firearms from component parts;

d.    Tools and equipment used for manufacturing firearms such as drill presses, taps, 3D printers, and pipe threading tools.  Also to include cleaning and maintenance equipment for said firearms, including solvents, cases, pipe cleaners, rags and holsters;

e.    Ammunition, including but not limited to live or spent casings for said firearms, magazines, or all loading devices;

f.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

g.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

h.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

i.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to

show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

l.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of firearms or ammunition;

m.   Contents of any calendar or date book;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the **Subject Offenses,** and forensic copies thereof.

p.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   <u>**SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress **HUEZO'**s thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of **HUEZO'**s face with his eyes open to activate

the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

### AFFIDAVIT

I, Arie Kuipers, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for warrants to search the following:

a.   The person of ANDRES **HUEZO**, aka "Rocko," ("**HUEZO**"), as described more fully in Attachment A-1; and

b.   37545 37th Street East, Palmdale, California 93550 (the "**SUBJECT PROPERTY**"), as described more fully in Attachment A-2.

2.   The requested search warrants seek authorization to search and seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm), 922(a)(1)(A) (Engaging in the Unlicensed Business of Firearms Dealing), 922(o) (Transfer or Possession of a Machine Gun) (the "**Subject Offenses**"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only, and all dates and times
are on or about those indicated.

## II. __BACKGROUND OF AFFIANT__

4.   I am a deputized Task Force Officer ("TFO") with the
Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  I
am also a Detective with the Los Angeles Police Department
("LAPD") and have been so employed since 2017.  I am currently
assigned to the LAPD/ATF Gun Violence Reduction Task Force,
where I investigate crimes pertaining to the illegal possession,
use, buying, selling, manufacturing, importation,
transportation, and trafficking of firearms.  Prior to the task
force, I was assigned to the LAPD Hollywood Gang Enforcement
Detail, where I investigated-and assisted with investigating-
gang crimes such as assault with deadly weapons, narcotics
sales, vandalism, robberies, and shootings.

5.   I graduated from the University of California, Davis
with a Bachelor of Arts degree in Political Science.  I also
graduated from the London School of Economics and Political
Science with a Master of Science degree in International
Relations.  My training includes completing the LAPD academy,
the LAPD detective school, the ATF Joint Law Enforcement Officer
Task Force Officer training, several hours of training on weapon
laws, and in-field training from seasoned ATF Agents, Task Force
Officers, and confidential informants on gun-related crimes and
dangerous weapons, including assault rifles, suppressors, and
machine guns.  I have also received training from LAPD Gang

Experts pertaining to the recognition, identification, and culture of Los Angeles-based criminal street gangs.

6.    I have participated in many aspects of criminal investigations including reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants. Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the subject matters of the investigations in which I have been involved in, including narcotics and firearms trafficking.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    In January 2024, law enforcement reviewed multiple text messages and pictures between a telephone (number 818-861-5871, believed to be used by **HUEZO**) and a co-conspirator named Luis GODINEZ discussing manufacturing, selling, and buying firearms and firearm parts, including "switch" Machinegun Conversion Devices ("MCDs) that convert semi-automatic weapons into fully automatic machine guns.  Based on my training and experience as described further below, I believe that there is probable cause to believe that **HUEZO**, a convicted felon with no federal firearms license, is in possession of firearms, firearm parts, and manufacturing tools.  Moreover, when law enforcement executed a search warrant at GODINEZ's residence, officers seized numerous firearms and ammunition, including machine guns. **HUEZO**'s text messages, phone location information, surveillance, and law enforcement databases confirm that **HUEZO** resides at the

**SUBJECT PROPERTY**.   Accordingly, I believe there is probable cause to believe that a search of **HUEZO** and the **SUBJECT PROPERTY** will constitute or yield evidence of violations of the **Subject Offenses** committed by **HUEZO**.

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

    **A.**    **Law Enforcement Find Multiple Illegal Firearms at GODINEZ's Residence**

    8.    Based on my own involvement in this investigation, my review of law enforcements reports, and discussions with other law enforcement officers involved in the investigation of this case, I am aware of the following:

    a.    On January 6, 2024, the Burbank Police Department ("BPD") arrested Luis GODINEZ, a convicted felon who was on probation for firearm offenses, for various narcotic offenses and other crimes.

    b.    Prior to his arrest, GODINEZ gave consent to officers to review his cell phone text messages.  During their initial review of the phone, officers saw that the telephone's photo application was open in the background and saw a photo of an assault rifle.  Officers subsequently searched through the messages on the phone and saw multiple conversations about firearms, including messages indicating that GODINEZ was selling 3-D printed "switches."  Based on my training and experience, I know that a "switch" refers to a device used to illegally

4

convert a semi-automatic firearm into a fully-automatic machine gun.[1]

c.   On January 9, 2024, BPD obtained a California state search warrant to search the contents of GODINEZ's cell phone.  During its review of the phone, law enforcement observed multiple messages and photos indicating that GODINEZ was manufacturing and selling switches and "ghost guns," i.e., firearms that do not bear serial numbers.  The messages also indicated that GODINEZ was purchasing firearms, including an AR-15 style rifle.

d.   Based on their investigation, BPD obtained a California state search warrant on January 10, 2024 to search GODINEZ's residence at 32476 Aliso Canyon Road, Acton, California 93510.

e.   On January 11, 2024, law enforcement executed the search warrant at GODINEZ's residence and recovered multiple assault rifles, switches, handguns, gun parts, and 3D printers that could be used to manufacture firearms and firearm parts. Because GODINEZ is a felon and prohibited from possessing firearms, BPD issued a warrant for GODINEZ's arrest.  GODINEZ is currently in custody in Wasco State Prison on charges unrelated

---

[1] Based on my training and experience, I know that a semi-automatic firearm is a repeating firearm that requires the shooter to manually engage the trigger for each round fired.  A fully-automatic machine gun, however, is a firearm that continuously chambers and fires rounds with a single trigger press and will fire continuously as long as the trigger is kept depressed and ammunition is available.

to the January 6, 2024 arrest and January 11, 2024 search
warrant.

**B.    Text Messages between GODINEZ and HUEZO Indicate
HUEZO, a Convicted Felon, is Engaging in Buying and
Selling Firearms:**

9.    Based on my review of police reports, conversations
with other law enforcement officers involved in this
investigation, and my review of messages on GODINEZ's phone, I
am aware of the following:

a.    GODINEZ's phone contained multiple messages
regarding firearms with number 818-861-5871, which as described
in detail below is believed to be **HUEZO**'s phone.  This number
was saved under the contact name, "ROCKO."  Using various police
department resources, BPD identified "ROCKO" as an alias for
**HUEZO.**

b.    The messages between GODINEZ and **HUEZO** indicate
that, from at least July 2023 to September 2023, GODINEZ and
**HUEZO** -- both convicted felons prohibited from possessing
firearms -- engaged in multiple transactions for firearms,
including machine guns.

c.    Specifically, on July 1, 2023, GODINEZ sent **HUEZO**
his (GODINEZ's) address in Acton.  **HUEZO** then asked GODINEZ if
he had the online payment platform "Cash App".[2]  On July 2, 2023,
GODINEZ asked **HUEZO**, "How much did you pay for that switch bro
and could you get another one?"  **HUEZO** responded with, "Sorry

_____

[2] Based on my training and experience, I know that "Cash
App" is an online wire transfer service used to digitally send
currency from one user to another.

just noticed the message. I got it on wish[2] when they were still
unnoticed long time ago." Based on my training and experience,
I believe that GODINEZ was inquiring whether **HUEZO** could get him
(GODINEZ) a "switch." As described above, a "switch" is a
device used to illegally convert a semi-automatic firearm into a
fully-automatic machine gun.

     d. That same day, GODINEZ sent **HUEZO** several
photographs of 3D-printed handgun lower receivers.[3] During the
conversation, **HUEZO** asked for a lower receiver with specific
colors. GODINEZ then asked **HUEZO** if he (**HUEZO**) would sell him
the "switch" in return for six handgun frames. Based on the
context of the text messages, it appears that **HUEZO** sold GODINEZ
the "switch". GODINEZ then sent more pictures of handgun lower
receivers, and GODINEZ wrote, "Do you still want the 10/22
receiver too? That's separate from the 6 frames I owe you what
color do you want the 10/22 receiver in?" Based on my training
and experience, a 10/22 refers to a Ruger 10/22 semi-automatic
rifle. **HUEZO** then wrote, "Yes…Red or black", and GODINEZ
responded with, "Ok so any rifle or AR 10/22 AKs or anything big
ima slide them to you for a $100 just cause they take more

---

[2] Based on my training and experience, I know that "Wish"
refers to the popular online e-commerce platform wish.com.

[3] Based on my training and experience, I know that a typical
semiautomatic handgun consists of a "slide" or "upper" and a
"frame" or "lower". The "frame" or "lower" is the part of the
firearm that typically constitutes the firearm, and therefore
the "slide" or "upper" can be easily purchased online without
required background checks.

material and time and any handgun frames I'll do $80 on them."[4]
GODINEZ then sent **HUEZO** a picture of the 10/22 receiver and
**HUEZO** told him that he wanted it in black color.

    e.    On July 3, 2023, GODINEZ and **HUEZO** had the
following conversation:

    -GODINEZ: "Hey I just tried the switch bro that shit
    is lit my boy I have it on the 20 10mm[5] that shit
    turned it into a fucken beast just let off 10 rounds
    in my garage and that shit is 100%"

    **-HUEZO:** Sent GODINEZ two photographs: One is a
    photograph of an AR-15 style rifle with a high-
    capacity drum magazine attached to it. The second
    photograph is of a Glock 43X pistol with a magazine
    affixed to it.

    -GODINEZ: Sent **HUEZO** several photographs of firearm
    lowers created by a 3D printer, which is the same
    design that **HUEZO** requested in a previous conversation
    (with an "LV" logo).  GODINEZ also sent photographs of
    two suspected rocket launchers, both of which were
    later recovered by BPD in the search warrant at
    GODINEZ's residence on January 11, 2024.

---

[4] Based on my training and experience, I know that "AR" is
referring to an AR-15 style rifle, "10/22" is referring to a
Ruger 10/22 semiautomatic rifle, and "AKs" is referring to AK47-
type rifle.

[5] Based on my training and experience, I know that "10mm" is
referring to a 10mm handgun.

-GODINEZ: "Hey my boy around 10 you can probably come by and pick 2 frames up a43 and 19[6]."

**-HUEZO:** "Coo man see u around that time Ill call u first"

-GODINEZ: "Ok for sure or I'll hyu once its done better cause the 19 frames at 89%[7] right now so it shouldn't be much longer so it can possibly be before thy time too"

**-HUEZO:** "Ok"

f.   On July 8, 2023, GODINEZ and **HUEZO** had the following conversation:

**-HUEZO:** "I forgot my phone at the pad just got it I'll be at your pad in 30 min"

**-HUEZO:** "37544 37st East Palmdale[8]

**-HUEZO:** Sent GODINEZ a link to eBay to purchase a slide for a Beretta 92SB 9mm handgun.

-GODINEZ: Told **HUEZO** that the frames he (**HUEZO**) was picking up should work for the slide for the Beretta.

---

[6] Based on my training and experience, I know that "43" and "19" refer to a Glock model 43 handgun and a Glock model 19 handgun

[7] Based on my training and experience, I know that "19 frames at 89%" refers to his 3D printer having only completed 89% of the frame.

[8] HUEZO provided an address that was one digit off (house number 37544) from the **SUBJECT PROPERTY** (house number 37545). I know based on my training and experience that suspects will intentionally provide nearby addresses as a way of attempting to distance themselves from their actual address and elude law enforcement.

g.   On July 12, 2023, GODINEZ and **HUEZO** had the following conversation:

-GODINEZ: "Hey you said you have Glock mags do you have any 9mm"

**-HUEZO:** "Yeah I do"

-GODINEZ: "Extendos[9] or regular"

**-HUEZO:** "Extendos…All 9's" [**HUEZO** then sent a photograph of several handgun magazines]

-GODINEZ: "How much"

**-HUEZO:** "Which one"

-GODINEZ: "The one on the right"

**-HUEZO:** "50"

h.   On July 31, 2023, GODINEZ and **HUEZO** had the following conversation:

-GODINEZ: "Hey you told me you had 22s the ammo you think I can have a some and when I get my order I'll slide it back to you…I just got my beretta 22[10] nickel plated so I'm building it right now."  GODINEZ then sent a picture of a small .22 caliber handgun

**-HUEZO:** "I have 22 or… 22lr…Only 22lr and 25"

-GODINEZ: "Let me get as many as you can let go of both I'll slide them back to you when I order mine or

---

[9] Based on my training and experience, I know that "extendos" refers an extended or high-capacity magazine.

[10] Based on my training and experience, I know that "Beretta 22" is referring to a Beretta .22 caliber handgun.

if you want we can work something out with some frames
or something out the printer…It's nickel plated."

-**HUEZO:** "Ok I'll get them to you today"

i.   On August 7, 2023, GODINEZ and **HUEZO** had the
following conversation:

-GODINEZ: "Not much foo hey that m&p shield[11] ima have
to make them in grey I ran out of black half way
through the o e I was making you my boys bringing me
some grey material today in the evening… Im working on
finishing my 1911[12] right now I have colt officers size
that I'm almost done with and mac10[13]…If you know
anyone trying to buy the mac10 let me know I want 2
racks[14] for you so you can make something on it too."
(GODINEZ then sent pictures of both the Mac 10 and
Colt 1911 pistol).

-GODINEZ: "I also have a Russian rpk[15] that's almost
done"

---

[11] Based on my training and experience, I know that "m&p
shield" is referring to a Smith & Wesson M&P Shield handgun

[12] Based on training and experience, I know that "1911" is
referring to a Colt 1911 handgun.

[13] Based on my training and experience, I know that "mac10"
is referring to a Military Armament Corporation (MAC) Model 10
firearm.

[14] Based on my training and experience, I know that a "rack"
is a common vernacular for $1,000.00.

[15] Based on my training and experience, "rpk" is referring
to "Ruchnoy Pulemyot Kalashnikova", which is an AK47-type Light
Machine Gun (LMG)

-**HUEZO**: "I wanted to ask you if you had any 1911
parts, I think I know what the issue with this one is
I wanted to test it"

-GODINEZ: GODINEZ then asks what parts **HUEZO** needed
and **HUEZO** told GODINEZ it's the "disconnect."

j.    On August 14, 2023, GODINEZ sent **HUEZO** a
photograph of his 3D printer with "Rockos Fullsize" as the title
on the machine.  As described above, I know that "Rocko" is an
alias of **HUEZO**'s.  GODINEZ then wrote, "My bad just saw your
message my boy I got your shield full-size on the printer right
now that foo finally brought the material…Your m&p full-size is
ready my boy let me know when you can scoop it up ima try to
have the compact o e done by tomorrow or the day after."
According to the text messages, it appears as though **HUEZO**
picked up his firearm from GODINEZ.

k.    On September 2, 2023, **HUEZO** and GODINEZ discuss
**HUEZO** coming over to GODINEZ's house, and GODINEZ says, "Ok just
know that the most we can shoot is 2 rounds don't want to do to
much and have neighbors trip out".

l.    On September 3, 2023, **HUEZO** sent GODINEZ two
photographs of frames stating, "So this is the frame."

m.    On September 23, 2023, **HUEZO** texted GODINEZ
asking if his order was ready. GODINEZ told **HUEZO** it was almost
ready, however, he needed a different color material to make the
"19 frame."

n.    On October 11, 2023, **HUEZO** texted GODINEZ, "What
up my boy wanted to know how the frames are coming a long."

**C.    Subscriber Records for HUEZO's Telephone**

10.   According to law enforcement databases, telephone number 818-861-5871 (the telephone number used to communicate with GODINEZ in the above-mentioned text messages), is associated with **HUEZO** at the address 37545 37th Street East Palmdale, California 93550 (<u>i.e.</u>, the **SUBJECT PROPERTY**).  This is nearly identical to the address that **HUEZO** provided to GODINEZ on July 8, 2023[16].  Moreover, cell phone records obtained via a California state search warrant on February 1, 2024 also show that the -5871 number is registered with the address of 37545 37th Street East Palmdale, California 93550.

**D.    HUEZO is a Convicted Felon and Does not Have a Federal Firearms License**

11.   I reviewed **HUEZO'**s criminal history and discovered that he has been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about December 19, 2005, a violation of California Penal Code Section 245(a)(1): Assault with a Deadly Weapon in the Superior Court for the State of California, County of Los Angeles, Case Number LA050169;

b.   On or about June 18, 2010, a violation of California Penal Code Section 12316(b)(1): Prohibited Person in Possession of Ammunition in the Superior Court for the State of California, County of Los Angeles, Case Number PA067050; and

---

[16] As mentioned earlier, HUEZO provided an address of "37544" in his text message to GODINEZ.

c.   On or about October 25, 2010, a violation of California Penal Code Section 459: Burglary in the Superior Court for the State of California, County of Los Angeles, Case Number BA364482.

12.   Based on my conversation with an ATF investigator, I know that HUEZO does not have a federal firearms license.

**E.   HUEZO Resides at the SUBJECT PROPERTY**

13.   As described above, **HUEZO**'s cellular phone (818-861-5871) is associated with **HUEZO** at 37545 37th Street East, Palmdale, California 93550 (the **SUBJECT PROPERTY**).

14.   On April 12th, 2024, ATF TFO Nicole Li obtained a search warrant for the Global Positioning System (GPS) latitude and longitude location data/cell tower location information from **HUEZO**'s cell phone number (818-861-5871).  The search warrant was authorized by the Honorable Patricia Donahue, United States Magistrate Judge.  See Case No. 2:24-MJ-02171.  Utilizing the search warrant, ATF TFO Li and I obtained GPS latitude and longitude data signal information from T Mobile.  The data signal information consistently shows the targeted telephone number (ending in -5871) in the area of the **SUBJECT PROPERTY.**

15.   On April 30, 2024, LAPD/ATF Gun Violence Reduction TFO Mario Aride and I conducted surveillance at 37545 37th Street East Palmdale, California 93550 (the **SUBJECT PROPERTY).**  During the surveillance, Officer Aride and I observed **HUEZO** exit the front door of the **SUBJECT PROPERTY**, approach a car parked in the driveway, and open the front driver's side door of the vehicle.

**HUEZO** then leaned into the vehicle, closed the front driver's side door, and reentered the **SUBJECT PROPERTY.**

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

16.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.   Firearm manufacturers, builders, and collectors are unlikely to frequently move the equipment commonly used in the illicit manufacturing, building, and collecting of firearms. Such tools and equipment (such as drill presses, 3D printers, filament, and other power tools) are burdensome to simply move as they can be large, heavy, and expensive.  Therefore, I know that firearm manufacturers, builders, and collectors often keep and store their tools, equipment, and the firearms and firearm parts themselves for long periods of time in their homes, garages, or other workshops.  Moreover, I know that individuals who manufacture, build, and buy/sell/trade firearms also tend to retain and preserve their stock of firearms/firearm parts in order sell or trade the firearm/firearm parts.  Further, **HUEZO** himself has not been arrested since the text messages that were exchanged between himself and GODINEZ.  This fact increases the likelihood that **HUEZO** remains in possession of firearms and firearms manufacturing tools and equipment, as he has had no incentive (as far as I am aware) to dispose of his tools, equipment, and firearms.

b.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, such as a vehicle, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

c.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

d.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

16

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

e.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[17]

17.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[17] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

18

develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

18. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a. Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction. Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above. Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b. Digital devices capable of storing multiple
gigabytes are now commonplace. As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

19. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

20.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **HUEZO**'s thumb and/or fingers on the devices; and (2) hold the device(s) in front of **HUEZO**'s face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20

21.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**VII. <u>CONCLUSION</u>**

22.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the person of **HUEZO** and the **SUBJECT PROPERTY**, as described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of May,
2024.

_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

21